718 So.2d 242 (1998)
Michael PINARDI, Appellant,
v.
STATE of Florida, Appellee.
No. 97-1823.
District Court of Appeal of Florida, Fifth District.
August 21, 1998.
Rehearing Denied October 5, 1998.
Burke D. Chester, Daytona Beach, for Appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Carmen F. Corrente, Assistant Attorney General, Daytona Beach, for Appellee.
*243 ANTOON, Judge.
Michael Pinardi (defendant) appeals the trial court's order denying his petition for postconviction relief.[1] A jury found defendant guilty of two counts of capital sexual battery[2] and six counts of lewd and lascivious assault[3] against his eight- and ten-year-old stepdaughters. After his judgments and sentences were affirmed by this court on direct appeal,[4] defendant filed a motion for postconviction relief asserting he was entitled to receive a new trial because his trial judge, Circuit Judge Gayle Graziano, had engaged in ex parte communications concerning two witnesses who testified at his bond hearing and trial. He contended that these communications established that Judge Graziano was biased against him and that as a result he was denied due process of law. The Florida Supreme Court appointed Senior Judge Clarence T. Johnson, Jr., to consider defendant's motion. After conducting an evidentiary hearing, Judge Johnson denied the motion finding that, although Judge Graziano had engaged in ex parte communications, defendant failed to establish that she was biased against him. Judge Johnson also found that defendant had received "a very fair and impartial trial."
Defendant appeals this ruling arguing the lower court erred in requiring him to prove that Judge Graziano was biased. Defendant contends instead that he is automatically entitled to receive a new trial because he established that Judge Graziano engaged in ex parte communications during the pendency of his criminal proceedings. We disagree and affirm.

FACTS
After defendant was arrested, a hearing was conducted before Judge Graziano to determine whether, by allegedly committing the instant offenses, defendant had violated the conditions of his previously imposed community control. At the hearing, the victims' mother complained to Judge Graziano that defendant's community control officer had told defendant that the state was investigating him with regard to charges of sexual battery and lewd and lascivious assault against her daughters. The mother was concerned that this disclosure had placed her daughters in danger because defendant had allegedly told the children that he would kill their mother with a knife in their presence if they ever told anyone about his crimes. At the postconviction relief hearing, Judge Graziano testified and admitted that she had called Probation and Parole Services and asked whether the department had a policy prohibiting its officers from leaking information to probationers regarding ongoing investigations. Judge Graziano explained that the call was not specifically related to defendant's case, but about the community control officers' conduct which she considered dangerous.
Defendant contends that during his trial Judge Graziano made a second ex parte telephone call to the assistant director of Probation and Parole Services who supervised probation and community control officers. The call purportedly concerned the trial testimony of two of defendant's former community control officers, Officers Dias and Gastelle, regarding their observations of defendant while he was on community control. At the postconviction hearing, Judge Graziano testified that she did not remember making the second call, and the assistant director of Probation and Parole Services testified that he could not recall whether he had received a call from Judge Graziano. The assistant director testified that he could not remember who called him or exactly what was said. He could only describe the call as an expression of "concern" regarding the community control officers' testimony at defendant's trial. Judge Johnson found that defendant had not proved that Judge Graziano made the second call, but went on to state that "the evidence suggests that she probably made or precipitated it." Although the evidence does not clearly establish that Judge Graziano made the second call, for purposes of this appeal, *244 we conclude that Judge Johnson found that Judge Graziano either personally made or prompted someone else to make the second telephone call to the Probation and Parole Services.
The testimony concerning the content of the second telephone call was nebulous. Officer Dias, who had initially supervised defendant, testified that he had been subpoenaed to appear at defendant's trial. According to Dias, after he testified, the assistant director of Probation and Parole asked Dias' supervisor why Dias had testified on behalf of defendant. Dias' supervisor answered that Dias had testified because he had been subpoenaed by defendant's attorney. Officer Gastelle stated that she had also testified at defendant's trial after having been subpoenaed by defense counsel. Gastelle explained that after she testified she was approached by the assistant director of Probation and Parole Services who was also her supervisor. Gastelle stated that the assistant director told her that he had received a telephone call from Judge Graziano and that she was unhappy with Gastelle's testimony.
During her testimony at the postconviction hearing, Judge Graziano testified that she was not biased against defendant during his trial, stating, "I actually thought [defendant] was innocent of the charges. He didn't strike me as the type to engage in that type of behavior. And I was surprised at the testimony at trial." Judge Graziano further stated that she "probably bent a little bit toward" defendant because one of his attorneys had been killed a short time before his trial had begun.
After considering all the evidence presented, Judge Johnson entered a detailed order denying defendant's request for postconviction relief, finding Judge Graziano's ex parte communications did not prejudice defendant or violate his due process rights. Defendant appeals this order.

ANALYSIS
At the onset, it is important to recognize that there are several types of errors which can occur in a criminal proceeding which afford a defendant the right to receive postconviction relief. One type includes errors which are classified as "structural defects in the trial mechanism," which if found to exist, are not subject to harmless error analysis and thus require a new trial. See Chapman v. California, 386 U.S. 18, 22-3, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Trials marred by structural defects are not subject to harmless error analysis because "[t]he entire conduct of the trial from beginning to end is obviously affected ..." by such an error. Arizona v. Fulminante, 499 U.S. 279, 309-10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Trials contaminated by structural defects include those in which the defendant has been deprived of counsel and those presided over by a biased judge. See Chapman, 386 U.S. at 23, n. 8, 87 S.Ct. 824, n. 8. In this case, we are presented with a claim of judicial bias.
A neutral judgeone without an interest in the outcome of a caseis an essential component of a criminal defendant's right to due process under the Fourteenth Amendment. Thus, when a trial judge is actually biased, a structural defect exists. For example, when a judge has a financial or personal interest in the outcome of a case, that judge's interest constitutes a structural defect that violates at least one of the parties' right to receive due process of law.
An often cited example of judicial bias constituting a structural defect is the case of Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927). Tumey was tried in Ohio for the unlawful possession of alcohol before a village mayor acting as a judicial officer. Id. at 516, 47 S.Ct. 437. Under Ohio law, the mayor received a portion of the fines collected from persons convicted in his court. Id. at 517, 47 S.Ct. 437. Following a nonjury trial, the mayor found Tumey guilty. Id. at 516, 47 S.Ct. 437. Upon review of Tumey's conviction, the Supreme Court ruled that Tumey's right to receive due process of law under the Fourteenth Amendment was violated because the mayor had a "direct personal pecuniary interest in convicting ..." him. Id. at 523, 47 S.Ct. 437.
Similarly, in Goines v. State, 708 So.2d 656, 661 (Fla. 4th DCA 1998), the fourth district held that Goines' attorney rendered ineffective *245 assistance of counsel in failing to seek a disqualification of the trial judge who, as an assistant state attorney, had previously prosecuted Goines. The fourth district reasoned that Goines was not required to prove prejudice in order to receive a new trial because the status of his trial judge "rendered the trial fundamentally unfair ... because of the appearance and risk of judicial bias." Id.
Both Tumey and Goines involved conflicts of interest based on the judge's status with regard to either the subject matter under review or a party to the action. In Tumey, the mayor personally profited by finding Tumey guilty and imposing a fine, and in Goines, the trial judge had previously acted as Goines' prosecutor. Proceedings such as these, in which the trial judge has a financial, personal, or professional interest in the outcome, contain a structural defect because the trial judge's interest in the outcome establishes the existence of a conflict of interest. Defendant illustrates this point well by arguing that had his trial judge been bribed to find him guilty, he should not be required to show prejudice before being entitled to receive a new trial. Defendant is correct that such facts would constitute a structural defect because the trial judge would have an interest in the outcome of the case. In those cases where such a structural defect exists, it is impossible in postconviction proceedings to determine whether it was harmless. After all, the existence of judges' conflicts of interest may be subtle and difficult to detect.
In the instant case, it is clear that Judge Graziano did not have a conflict of interest by virtue of her status as to the parties or the subject matter. However, defendant maintains that proof of an ex parte judicial communication alone constitutes a structural defect. The issue of whether an ex parte communication on the part of a trial judge constitutes a structural defect was considered and rejected by the United States Supreme Court in Rushen v. Spain, 464 U.S. 114, 119, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983).
After Spain was convicted for murder and conspiracy to escape, his trial counsel learned of ex parte communications between one of the jurors and the trial judge. Id. at 116, 104 S.Ct. 453. These ex parte communications occurred when a juror went to the trial judge's chambers twice during the trial and told him that she was a childhood friend of one of the defense witness' murder victims. Id. The juror assured the trial judge that her disposition of the case would not be affected by her recollection of this crime, and the trial court did not inform the parties about these conversations. Id. At the hearing on Spain's motion for a new trial, the juror testified that "her subsequent recollection did not affect her ability impartially to [decide Spain's] innocence or guilt." Id. Accordingly, the trial court concluded that Spain was not entitled to receive a new trial because the ex parte communications did not prejudice Spain. Id. The California Court of Appeal affirmed and the California Supreme Court denied review. Id. at 117, 104 S.Ct. 453. However, the Federal District Court issued a writ of habeas corpus, finding that the ex parte communication violated Spain's due process rights to be present at all critical stages of the proceeding and to be represented by counsel. Id. Taking a position similar to the one advanced by defendant here, the Court of Appeals for the Ninth Circuit affirmed holding "that an unrecorded ex parte communication between trial judge and juror can never be harmless error." Id.
Upon review, the United States Supreme Court reversed. The Supreme Court held that ex parte communications do not automatically entitle a defendant to receive a new trial, explaining that "[w]hen an ex parte communication relates to some aspect of the trial, the trial judge generally should disclose the communication to counsel for all parties. The prejudicial effect of a failure to do so, however, can normally be determined by a post-trial hearing." Id. at 119, 104 S.Ct. 453 (footnote omitted). The Court reasoned that "[t]he adequacy of any remedy is determined solely by its ability to mitigate constitutional error, if any, that has occurred," and the evidence presented at Spain's post-trial hearing revealed that the ex parte communications were "innocuous." Id. at 121, 104 S.Ct. 453. In particular, the juror testified that her association with the defense witness' murder victim in 1968 did not affect her *246 impartiality and the trial judge and the juror did not discuss "any fact in controversy or any law applicable to the case." Id.
The approach adopted by the court in Rushen to resolve motions for postconviction relief involving ex parte communications occurring during the course of criminal proceedings is practical and adheres to common sense. It allows the judge presiding over a postconviction proceeding to make a quantitative assessment of the impact of the ex parte communications on the trial considering the content and context in which they were made. This procedure acknowledges that the trial court conducting the postconviction evidentiary hearing is in the best position to determine, based on the evidence presented, whether the judge's ex parte communications reflect a bias on the part of the trial judge and whether the defendant was prejudiced by the communication. If the comments reveal that the judge had a conflict of interest or that the judge interfered with the defendant's constitutional right to receive a fair trial, the court may grant relief. On the other hand, if the ex parte communication is innocuous and not a comment on the facts in controversy or the applicable law, the reviewing judge may deny postconviction relief allowing the conviction to stand subject to further review. In reaching its decision, the reviewing court has the advantage of hearing and observing the witnesses in weighing their credibility. Furthermore, this approach affords finality to criminal proceedings.
In contrast, application of the bright-line approach advocated by defendant would reap disastrous results. Many cases would be unnecessarily retried long after the occurrence of events leading to the criminal charges. Moreover, verdicts, judgments, and sentences would be disturbed in cases involving overwhelming evidence of guilt. Such a procedure would undermine public confidence in the court system.
In the instant case, Judge Johnson followed the procedure prescribed by the Supreme Court in Rushen and in doing so determined that defendant was not entitled to receive a new trial because Judge Graziano's ex parte communications did not compromise his due process rights. Judge Johnson recognized that Judge Graziano's comments did not involve the facts in controversy or any law applicable to defendant's case, nor did they reflect an interest or bias.
In determining whether Judge Graziano's comments evidenced any bias, Judge Johnson considered them in the context in which they were made. With regard to the inquiry to Probation and Parole Services regarding its policy vel non of tipping off probationers regarding imminent arrests, Judge Graziano responded to what she reasonably considered to be a procedural problem. At the time, Judge Graziano was chief judge of the Seventh Judicial Circuit and was understandably alarmed by the discovery that a community control officer had alerted defendant about the investigation which led to his arrest for the sexual battery of his stepdaughters. When she made the call, Judge Graziano was attempting to determine whether the community control officer's conduct was sanctioned by the department. Obviously, if it was, a serious problem existed which could have resulted not only in the possible flight of defendants seeking to avoid arrest, but also intimidation of witnesses. Judge Graziano's concerns regarding the information leaked to defendant were shared by the assistant director of Probation and Parole Services who testified at the hearing that it was not the department's policy to advise suspects of investigations involving substantive violations of community control. These circumstances would have prompted any reasonable judge to make such an inquiry, and the inquiry does not evidence any bias against defendant. Moreover, it appears that such communication did not constitute an improper ex parte communication because it was merely a question regarding departmental policy and not a comment regarding defendant's pending case.[5]
*247 The second call is more problematic because the content was never specifically described. The assistant director of Probation and Parole Services could only recall that the caller expressed some "concern" about the community control officers' participation in the trial. The contents of this alleged telephone communication were so innocuous that it is unlikely that they would have been sufficient to constitute a factual basis for disqualification pursuant to rule 2.160 of the Florida Rules of Judicial Administration. See e.g., Rivera v. State, 23 Fla. L. Weekly S343, 717 So.2d 477 (Fla. June 11, 1998)(holding judge's comment presiding over a postconviction evidentiary hearing that: "I am inalterably opposed to any consideration for Executive Clemency and I believe the sentence (death) should be carried out as soon as possible" did not constitute a sufficient basis for disqualification). It is also important to note that Officers Dias and Gastelle did not know about either of the telephone calls until long after they had testified; therefore, they could not have influenced their trial testimony.

CONCLUSION
Judge Graziano's ex parte communications to Probation and Parole Services were not structural defects. See Rushen, 464 U.S. at 119, 104 S.Ct. 453. After conducting a thorough evidentiary hearing, Judge Johnson assessed the communications to be harmless and set forth specific findings of fact which are clearly supported by the record. Judge Johnson determined that Judge Graziano was not biased against defendant, and that defendant had received a "very fair and impartial trial." Defendant asks us to look beyond these findings, but the law does not allow us to do so. This court is not in a position to gainsay Judge Johnson's well-reasoned conclusions based on his having heard the witnesses and having observed the evidence during the course of the evidentiary hearing. As long as the trial court's findings are supported by competent substantial evidence, this court is not authorized to substitute its judgment on questions of fact, credibility of the witnesses, or the weight to be given to the evidence by the trial court. See Blanco v. State, 702 So.2d 1250, 1252 (Fla.1997). Accordingly, we must affirm.
AFFIRMED.
DAUKSCH, J., concurs.
HARRIS, J., dissents with opinion.
HARRIS, Judge, dissenting.
Pinardi appeals from the denial of his 3.850 motion for post-conviction relief claiming that he was denied a fair trial in that he was not provided an impartial judge as required by the due process provisions of the Florida and United States Constitutions. Pinardi's claim is based on the fact that a year after his trial he learned that his trial judge, during his trial, called the supervisor in the probation office and complained that probation officers had testified on defendant's behalf.[1] Pinardi contends that this act is indicative of bias. I agree.
A judge assigned to hear Pinardi's motion concluded that "although the evidence suggests that [the judge] probably made or precipitated" the call, it was immaterial because there was no showing that her ex parte communications had any effect on the witnesses or prevented the defendant from being able to defend himself. Therefore, the *248 motion was denied because the court's action was considered harmless. By finding that the defendant had not demonstrated bias the court was saying no more than that judicial bias was not reflected by the court's handling of the case as reflected by the record.
If the failure to have an unbiased judge is subject to the harmless error rule so that one must be able to point to the record and show where the judge's bias affected the outcome of the trial, then the denial of relief was proper. Judicial bias is not apparent in the trial record now before this court. But judicial bias can be discreet and subtle. It can affect the judge's demeanor, or the judge's temperament. It can appear in the judge's glance, or in the judge's tone of voice. It can be hidden in discretionary rulings. Indeed, judicial bias can work its evil even without the realization of the offending judge. Without a word being spoken, judicial bias can send a powerful message to the jury: "The judge thinks he is guilty."
Every defendant is entitled to the cold neutrality of an impartial judge. It is cold neutrality that is the guarantor of justice when the charges themselves are so offensive (sexual abuse of children in this case) that the mere allegations can overwhelm the evidence.
It is not the judge's place, particularly during the trial, to criticize witnesses, even state employees, for appearing as witnesses for the defense. It is the defendant's right to call any witness who may have evidence helpful to him. The judge has no right to complain to such witnesses' supervisors about such witnesses appearing. This conduct, at the very least, gives the appearance of partiality for the State and against the defense. Certainly a timely motion to disqualify the judge, had the defense been aware of the judge's conduct, should have been granted, not only because the judge's impartiality is brought into question, but also because the integrity of the criminal justice system will not permit even the appearance that the judge may be unfair. Is the defendant's right to an impartial judge any less because he learned after his trial of the judge's telephone call? Judge Farmer addressed a similar issue in Goines v. State, 708 So.2d 656, 23 FLW D921 (Fla. 4th DCA April 8, 1998), and held the second component of Strickland inapplicable:
As we noted earlier, the Florida Supreme Court has held that trial before a judge whose impartiality may reasonably be questioned "would present grave due process concerns," because "proceedings involving criminal charges ... must both be and appear to be fundamentally fair." Steinhorst, 636 So.2d at 500-01. We therefore conclude that defendant has satisfied that part of Lockhart defining prejudice as a showing that counsel's error rendered the trial fundamentally unfairin this case because of the appearance and risk of judicial bias.
In Arizona v. Fulminante, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), the United States Supreme Court stated:
There are structural defects in the constitution of the trial mechanism, which defy analysis by "harmless error" standards. The entire conduct of the trial from beginning to end is obviously affected by the absence of counsel for a criminal defendant, just as it is by the presence on the bench of a judge who is not impartial.
The United States Supreme Court thus made it clear that when the issue is judicial bias or the denial of counsel, the Strickland test is not applicable. The Louisiana Supreme Court explained its reading of Fulminante as follows[2]:
Structural defects in the trial mechanism are not trial errors and cannot be analyzed under a harmless error standard. Structural defects include: the complete denial of counsel ... and adjudication by a biased judge .... The entire conduct of a trial is affected by the ... presence of a biased judge on the bench.
The majority's reliance on Rushen v. Spain, 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) is simply misplaced. Certainly one can envision ex parte communications with a judge, even during a trial, that could be harmless. For example, a discussion *249 in chambers between the defense counsel and the judge about a scheduling conflict later in the trial week or between the prosecutor and the judge about a problem in getting a particular witness in court on a certain day. Although a private conversation between a judge and only one of the attorneys during a trial might be unseemly, it should not, in and of itself, require a new trial if the content of their discussion does not indicate judicial bias.
We should closely examine the facts in Rushen. There, it was not judicial bias at issue; it was the potential bias of the juror. The trial court made a determination, after speaking with the juror ex parte, that the juror was not biased and the Supreme Court agreed. Even though the trial court should not have conducted the ex parte meeting with the juror, the content of the meeting was found to be "innocuous" in so far as a fair trial was concerned. But in our case, the judge initiated the ex parte discussion with the supervisor of the state employees in which she made known her displeasure with such employees appearing as witnesses for the defense. This reflects judicial bias against the defense and is a structural defect.
I submit that it is not essential to show judicial error when the issue is judicial bias. Proof of judicial bias alone is sufficient to carry the day. I share the majority's concern that cases may have to be reversed long after the trial of the cause if we insist that an unbiased judge is essential to a fair trial. It is comforting, however, that except in cases in which the judge actually has a financial interest in the outcome of the trialas reflected by the cases cited by the majority judicial bias is rarely so clearly documented as in this case.
NOTES
[1] See Fla. R.Crim. P. 3.850.
[2] § 794.011(2), Fla. Stat. (1991).
[3] § 800.04(1), Fla. Stat. (1991).
[4] See Pinardi v. State, 645 So.2d 484 (Fla. 5th DCA 1994).
[5] Improper ex parte communications are proscribed by Canon 3 B(7) of the Florida Code of Judicial Conduct. In relevant part, the provision states:

A judge shall not initiate, permit, or consider ex parte communications, ... concerning a pending or impending proceeding except that:
(a) Where circumstances require, ex parte communications for scheduling, administrative purposes, or emergencies that do not deal with substantive matters or issues on the merits are authorized, provided:
(i) the judge reasonably believes that no party will gain a procedural or tactical advantage as a result of the ex parte communication, and
(ii) the judge makes provision promptly to notify all other parties of the substance of the ex parte communication and allows an opportunity to respond.
(Emphasis added).
[1] I agree with the majority that the first ex parte communication between the judge and the probation supervisor relating to the "leaking" of information to probationers about an ongoing investigation was not itself improper. The timing of the communication, however, after the probationer has become a defendant is troubling. And even this communication takes on added significance when coupled with the second ex parte communication.
[2] State v. Cage, 583 So.2d 1125, 1127 (La.1991).